IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. CHRISTOPHER CRAIG AND KYLE KOZA, <br> PLAINTIFFS, <br><br> *v.* <br><br> GEORGIA TECH RESEARCH CORP. AND BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA (D/B/A THE GEORGIA INSTITUTE OF TECHNOLOGY), <br> DEFENDANTS. | Civil Action No. <br><br> 1:22-cv-02698-JPB |

**UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, the United States of America, by counsel, respectfully submits this memorandum in opposition to the Motion to Dismiss the United States' Complaint in Intervention filed by Defendants Georgia Tech Research Corporation (GTRC) and the Board of Regents of the University System of Georgia, doing business as the Georgia Institute of Technology (Georgia Tech). For the reasons below, the Court should deny Defendants' Motion.

## INTRODUCTION

The United States' Complaint alleges that Defendants violated federal cybersecurity regulations found in the Federal Acquisition Regulation (FAR) and Defense Federal Acquisition Regulation Supplement (DFARS) with respect to at least two contracts, known as EA and SMOKE, associated with Georgia Tech's Astrolavos Lab. As alleged in the Complaint, the relevant cybersecurity requirements obligated Defendants to implement security controls that adequately protect sensitive, non-public DoD information and to conduct and post the results of self-assessments of compliance with the necessary controls in DoD's Supplier Performance Risk Management System (SPRS).

Rather than comply with these requirements, Defendants allowed Georgia Tech's Astrolavos Lab to perform cyber defense research for DoD for years without implementing basic security controls, including a system security plan (SSP) and antivirus software. Defendants also submitted a false, fictitious SPRS

score, which they knew was misleading, specifically to obtain DoD contracts, including those performed at the Astrolavos Lab.  To recover for this fraud, the United States has asserted claims under the False Claims Act (FCA), 31 U.S.C. §§ 3279-33, against GTRC, and under the federal common law against both Defendants.

Defendants' Motion broadly argues that all claims asserted against them should be dismissed because the contracts at issue involved fundamental research, which Defendants claim absolves them of any obligation to implement the federal cybersecurity protections included in their contracts and identified in the United States' Complaint.  But the contracts do not state that they are limited to fundamental research.  In an attempt to show otherwise, Defendants request that the Court go well outside the pleadings and dispose of the United States' claims based on 1,000-plus pages of exhibits Defendants self-select.  The factual inquiry Defendants seek is impermissible at the pleading stage and, in any event, to the extent documents Defendants reference can be considered now, they do not foreclose the United States' allegations.

Turning to the actual allegations of the Complaint, Defendants fail to show that the United States' pleading is deficient under Rules 12(b)(6) and 9(b).  With respect to the FCA claims that comprise the bulk of Defendants' Motion, the United States properly pled the elements of falsity, scienter, and materiality.

Specifically, the United States alleged that Defendants failed to comply with multiple cybersecurity requirements that applied to the EA and SMOKE contracts, both expressly and impliedly certified their compliance with all applicable cyber requirements, and that such statements were false.  Further, the Complaint is replete with allegations that Defendants knew the federal cybersecurity requirements applied, knew that there were issues with their cyber compliance, and knew the consequences of noncompliance, which satisfy the element of scienter. And the United States has alleged materiality properly, including by explaining the importance of federal cybersecurity regulations to the nation's security and the contracts at issue, and by identifying actions taken to address Defendants' noncompliance.  These allegations, which must be accepted as true, compel denial of Defendants' Motion as to the FCA claims.  They also compel denial of Defendants' Motion as to the United States' common law claims, to which Defendants devote substantially less attention, largely recycling their flawed FCA-related arguments.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation

that discovery will reveal evidence of' the necessary element." *Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  In other words, Rule 8 "demands more than an unadorned 'defendant-harmed-me accusation,'" but not "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must "view the allegations of the complaint in the light most favorable to the plaintiff," "accept as true the well-pleaded allegations," and "draw all reasonable inferences in the plaintiff's favor." *McCarthy v. City or Cordele*, 111 F.4th 1141, 1145 (11th Cir. 2024).  "If a district court considers matters outside the pleadings in adjudicating a Rule 12(b)(6) motion to dismiss," the motion typically must be "converted into a Rule 56 motion for summary judgment." *Sequeira v. Steinlauf*, 759 F. App'x 792, 794 (11th Cir. 2018).  In such an instance, the court must "notify the parties" and "give them a reasonable time to respond." *Id.*[1]

In addition, Federal Rule of Civil Procedure 9(b) provides that a party alleging fraud "must state with particularity the circumstances constituting fraud."

---

[1] Flouting this rule, Defendants ask the Court to consider their voluminous set of exhibits in resolving the Motion to Dismiss without converting it to a motion for summary judgment.  *See* Memo 20 n. 5.  As set out in the United States' Opposition to Defendants' separate Motion for Judicial Notice (hereinafter "MJN Opp."), Defendants' request is largely improper.  Defendants' Motion, Dkt. No. 35, is hereinafter referred to as the "MJN," and the United States' opposition thereto, the "MJN Opp."

*Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015). "To satisfy this heightened-pleading standard," fraud and FCA allegations in a complaint must have "facts as to time, place, and substance of the defendant's alleged fraud, particularly, the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them," although scienter may be alleged "generally." *Id.* (internal quotation marks and citation omitted).

 "Rule 9(b) serves two purposes: alerting defendants to the precise misconduct with which they are charged" and protecting "against spurious charges of immoral and fraudulent behavior." *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1317 (11th Cir. 2024) (internal citations omitted). "That said, a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of Rule 9(b) with the broader policy of notice pleading" and "hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial pre-discovery evidence of those facts." *Id.* at 1318 (internal citations omitted).

## BACKGROUND

## I.    Federal Cybersecurity Requirements

DoD has warned its contractors for years that "to protect themselves and to

protect national security," cybersecurity must be a "part of doing business" with the government.  Compl. ¶ 5.  Contractors who fail to heed these warnings, like Defendants here, risk significant harm to DoD's intellectual property and strategic advantage as cyber criminals and other adversaries seek to infiltrate the companies and organizations making up DoD's supply chain to further their own intelligence and operational interests.  *Id*. ¶¶ 3-4.  Given the size and scale of the defense sector, DoD cannot conduct its own on-site assessments of the cybersecurity protocols in place at its approximately 220,000 contractors.  *Id.* ¶ 74.  Instead, DoD relies on its contractors, like Defendants, to comply with core federal cybersecurity obligations set out in their contracts and DoD's regulations, and to report the state of their compliance to DoD.  *Id.*  These regulations include the provisions found in DFARS 7008, 7012, 7019, and 7020, and FAR 52.204-21, discussed below.

### A.    DFARS 7012 requires adequate security and NIST SP 800-171 compliance.

Since 2013, DFARS 7012 has required DoD contractors to "provide adequate security on all covered contractor information systems," meaning those systems that process, store, or transmit "covered defense information."  48 C.F.R. §§ 252.204-7012(a), (b).  DFARS 7012 defines covered defense information (CDI) as "unclassified controlled technical information or other information, as described in the Controlled Unclassified Information (CUI) Registry at http://www.archives.gov/cui/registry/category-list.html, that requires safeguarding

or dissemination controls." *Id.* § 252.204-7012(a). CDI includes "controlled technical information" (CTI), which is technical information with "military or space application that is subject to controls on the access, use, reproduction, modification, performance, display, release, disclosure, or dissemination." *Id.* CTI meets the criteria for DoD Distribution Statements B through F, meaning it is not generally subject to public release. *See* Compl. ¶¶ 113, 120, 141.

In other words, CDI is information that requires safeguarding and dissemination controls to limit its distribution and public release. CDI may be "[m]arked or otherwise identified in the contract, task order, or delivery order and provided to the contractor by or on behalf of DoD" or it may be "[c]ollected, developed, received, used or stored by or on behalf of the contractor in . . . performance of the contract." 48 C.F.R. § 252.204-7012(a).

To provide "adequate security" for the systems that process, store, or transmit CDI, contractors and subcontractors must implement "protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information." *Id.* Pursuant to DFARS 7012, this requires – "at a minimum" – compliance with the National Institute of Standards and Technology Special Publication 800-171, Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations (NIST SP 800-171). *See id.* § 252.204-7012(b)(2)(i). Since October 21, 2016,

DFARS 7012 has mandated that contractors "shall implement NIST SP 800-171, as soon as practical but not later than December 31, 2017." *Id.* at § 252.204-7012(b)(2)(ii)(A); *see also* 81 Fed. Reg. 72986, 73000-73001 (Oct. 21, 2016).

### B.   DFARS 7008 requires contractors to certify DFARS 7012 compliance.

DFARS 7008 further mandates that contractors certify their compliance with DFARS 7012 and NIST SP 800-171 when submitting offers to DoD.  It specifies that "by submission of [the] offer, the Offeror represents that it will implement the security requirements specified by [NIST SP 800-171] . . . that are in effect at the time the solicitation is issued or as authorized by the contracting officer not later than December 31, 2017."  48 C.F.R. § 252.204-7008(c)(1).[2]  In issuing the final rule implementing DFARS 7008, DoD advised that the provision "puts the offeror on notice that, when performance of the contracts requires covered defense information on a covered contractor information system, the requirements of NIST SP 800-171 apply and must be implemented no later than December 31, 2017."  81 Fed. Reg. 72986, 72990 (Oct. 21, 2016).

---

[2] Contractors may request a variance from the NIST requirements, but the DoD Chief Information Officer must adjudicate the request in writing and grant it only if determining the requirement is "not applicable" or "an alternative but equally effective" control is in place.  48 C.F.R. § 252.204-7008(c)(2).

### C.    DFARS 7019 and 7020 mandate assessment and submission of accurate summary level scores of NIST compliance.

In 2020, DoD enacted DFARS 7019 and 7020 to strengthen its insight as to the cybersecurity posture of its contractors and to verify their abilities to "adequately protect sensitive unclassified information." 85 Fed. Reg. 61505, 61507 (Sept. 29, 2020); *see also* Compl. ¶ 72. DFARS 7019 requires contractors to conduct and post in SPRS a summary level score assessing compliance with NIST SP 800-171 "for each covered contractor information system that is relevant to the offer." *See* 48 C.F.R. § 252.204-7019(b); *see also id*. § 252.204-7019(c)(1). Doing so is a condition of contract award – an offeror who fails to post a current assessment for each relevant system cannot be "considered for award." *Id.* § 252.204-7019(b); Compl. ¶ 73. DFARS 7020 specifies that the assessment be "based on the Contractor's review of their system security plan(s) associated with covered contractor information system(s)" and "conducted in accordance with the NIST SP 800-171 DoD Assessment Methodology." 48 C.F.R. § 252.204-7020 (a).

### D.    NIST SP 800-171 requires an SSP and antivirus controls.

To comply with NIST SP 800-171, a contractor must implement 110 security controls on their covered systems. *See id.* ¶ 72. The controls include, for example, requirements that the contractor install, run, and update on the relevant system's anti-malware and incident detection software (*i.e.*, antivirus controls). *Id.* ¶¶ 85-89. Compliance also requires an SSP covering the relevant systems. *Id.* ¶¶ 77-81.

These requirements are key elements of a cybersecurity program: an SSP is so basic that, per the DoD Assessment Methodology, a contractor cannot even calculate a summary level score to be reported in SPRS for a system that lacks one. *Id.* ¶¶ 78-79 ("absence of a system security plan" is "noncompliance with DFARS clause 252.204-7012"). The DoD Assessment Methodology similarly recognizes that a contractor's failure to implement antivirus controls "could lead to significant exploitation of the network, or exfiltration of DoD CUI." *Id.* ¶ 90. Since at least June 2015, NIST controls 3.14.2, 3.14.4, and 3.14.5 have thus specified that contractors are to (1) "Provide protection from malicious code at designated locations within organizational systems"; (2) "Update malicious code protection mechanisms when new releases are available"; and (3) "Perform periodic scans of organizational systems and real-time scans of files from external sources as files are downloaded, opened, or executed." *Id.* ¶ 86.

    **E.    FAR 52.204-21 also mandates basic safeguarding of federal contract information (FCI).**

In addition to the DFARS requirements, all federal contractors must implement "basic safeguard[s]" for each information system that "processes, stores, or transmits Federal contract information." 48 C.F.R. §§52.204-21(a), (b). FCI is broader than CDI or CUI – it includes any "information, not intended for public release, that is provided by or generated for the Government under a contract to develop or deliver a product or service to the Government." *Id* §

52.204-21(a).  Per FAR 52.204-21, the "basic safeguard[s]" contractors must

implement include antivirus controls mirroring NIST 3.14.2, 3.14.4, and 3.14.5.

*Id.* § 52.204-21(b)(xii)-(xv); *see also* Compl. ¶ 95.

## II.    United States' Complaint-In-Intervention

The United States' Complaint asserts eight causes of action based on

allegations that Defendants violated their federal cybersecurity obligations in three

ways.  *First*, in connection with the EA and SMOKE contracts, Defendants failed

to provide adequate security or basic safeguarding of CDI and FCI because, during

performance of the awards, the Astrolavos Lab either had no SSP in place at all or

implemented one that Defendants have admitted was inadequate.  *Second*, in

connection with EA, Defendants also failed to provide adequate security or basic

safeguarding because they allowed the Lab to operate, for years, without antivirus

controls.  *Third*, in December 2020, Defendants created and reported to DoD in

SPRS a "fictitious" summary level score that did not accurately reflect the status of

NIST-compliance in the Lab or any other Georgia Tech environment.  Defendants

did so in order to be eligible to bid on and obtain DoD awards.

### A.    The EA and SMOKE contracts.

EA and SMOKE are both cyber defense research projects.  The EA contract was a

joint effort between the U.S. Air Force and the Defense Advanced Research

Projects Agency (DARPA), a DoD agency focused on advancing cutting edge

national security technology.  The project sought to develop enhanced attribution

technology allowing DoD to identify the parties behind cyberattacks.  *See* Compl.

¶¶ 103-104.  Astrolavos Lab director, Dr. Manos Antonakakis, acted as principal

investigator for the Lab's work on the EA contract, which was executed in

November 2016.  *Id.* ¶ 102.

The EA contract specified that the items to be delivered were "for both civil

and military applications."  *Id.* ¶ 109.  A DoD Contract Security Classification

Specification (DD 254) – the form DoD uses to communicate security

requirements to contractors – was attached to the contract, advising that performers

would receive information up to the level of "Top Secret," including information

that was "for official use only," and requiring the "prior written approval of

DARPA" prior to release.  *See id.* ¶¶ 105, 107 109-110, 115.  It also included a

Contract Data Requirements List (CDRL) advising that Distribution Statement F

applied, indicating the contract would involve CTI and CDI.  *See id.* ¶ 113.  The

contract incorporated DFARS 7012 and FAR 52.204-21 and required GTRC's

certification of compliance pursuant to DFARS 7008.  *See id.* ¶¶ 108, 111, 120.

The Astrolavos Lab worked on the EA award from December 2016 through at least

August 2021.  *See id.* ¶¶ 102, 285.

GTRC and DARPA first executed the SMOKE contract, which called for the

development of tools to automate the planning and deployment of attribution-

aware cybersecurity infrastructure, in October 2022.  *See id.* ¶¶ 123, 127.  Almost

immediately, the parties modified the contract to include additional non-

fundamental research tasks.  *Id.* ¶¶ 127-128.  Like EA, SMOKE was subject to

federal cybersecurity requirements.  The contract incorporated FAR 52.204-21,

DFARS 7012, and DFARS 7020, and the solicitation required proposers to certify

compliance with DFARS 7019, which GTRC did.  *See id.* ¶¶ 124-125, 128-129.

DARPA issued DD 254's for SMOKE on September 27, 2022 and August 23,

2023, which both reflected that the contractor would "receive, store, or generate

controlled unclassified information" and "protect CUI" during performance.  *Id.* ¶¶

130, 131.  The DD 254s further required "prior written approval" for the public

release of "any information."  *Id.* ¶ 132.  The Astrolavos Lab began work on the

SMOKE contract in October 2022.  *Id.* ¶ 287.

### B.  The Astrolavos Lab had CDI and FCI.

Consistent with the contracts themselves and the sensitive nature of the work

performed, the Astrolavos Lab received and stored CDI and FCI in connection with

EA and SMOKE, which Defendants knew.  For example, emails Dr. Antonakakis

sent during the performance of EA note that presentation slides he created in

connection with the project are "at the UNCLASSIFIED // DISTRIBUTION F

level," which he understood meant others "*should not* have access to the[m]

without explicit permission from DARPA and/or AFRL."  *Id.* ¶ 137.  His final

report to DoD also included information marked as CUI and to which DoD applied Distribution Statement D, meaning the final report could be distributed only to the "Department of Defense and U.S. DoD Contractors." *Id.* ¶¶ 141-142. Internal communications with Will Garrison, the head of IT for the Astrolavos Lab, further discuss the presence of a "shit ton" of CUI on servers and "hosts" throughout the Lab. *See id.* ¶¶ 144, 147. The Lab's presentation to DARPA for the SMOKE kickoff meeting similarly included CUI, as marked on several of Dr. Antonakakis' slides, *id.* ¶ 150, and, in anticipation of beginning work on the award, Lab personnel acknowledged the project would "include CUI" and "require CUI compliance." *Id.* ¶ 148.

C. **Defendants failed to provide adequate security.**

Despite knowing that the Astrolavos Lab possessed CUI or other information protected as CDI and FCI, Defendants allowed the Lab to operate without any SSP at all until at least February 2020. *Id.* ¶¶ 136-150, 159. Even when Defendants did belatedly implement one, their own employees knew it was deficient, both because it did not apply to all relevant endpoints and was never substantively updated, which is noncompliant with the NIST requirements "the same way the failure to create an SSP in the first place is not in compliance." *Id.* ¶¶ 162-66. Thus, at no time during the performance of EA or SMOKE, did the Astrolavos Lab have an adequate SSP.

Throughout nearly the entire performance of EA, the Astrolavos Lab also failed to install, update, or run antivirus controls. *Id.* ¶¶ 175, 185. The Lab failed to do so because Dr. Antonakakis simply did not want to. *Id.* ¶¶ 185-186. Faced with his resistance, Defendants allowed the Lab to rely on Georgia Tech's network firewall, which was inconsistent with their DoD obligations and internal policies. *Id.* ¶¶ 188, 189. This continued for years until, in late 2021, relators (both members of Georgia Tech's cybersecurity team) brought it to the attention of Rebecca Caravati, who was then the general manager of GTRC and executive director of the Georgia Tech office overseeing government contracting. *Id.* ¶¶ 190-191, 195. Caravati understood the Lab's "noncompliance" violated the DoD cybersecurity requirements, and federal funds could not go to the Lab without a potential "false claim." *Id.* ¶¶ 191-195. She even directed that billing to the EA contract be temporarily suspended until Dr. Antonakakis relented. *Id.*

### D. Defendants submitted a false summary level score.

Defendants further violated their federal cybersecurity obligations by, in December 2020, submitting their false summary level score to DoD. At that time, Defendants reported in SPRS a score of 98 (out of a possible 110) as a single enterprise level score for the Georgia Tech campus – the score of 98, however, did not apply to the Georgia Tech campus as a whole or to any individual lab, including the Astrolavos Lab. To the contrary, Defendants manufactured the score

based on a "model" SSP that was not applicable to any "active research" or any "actual IT system." *See, e.g., id.* ¶¶ 207, 211, 212, 213, 256. In other words, rather than report to DoD any assessment of NIST SP 800-171 compliance for Georgia Tech's relevant IT systems, Defendants simply made something up.

At the time, Defendants understood that summary level scores documenting *actual* compliance were needed to be eligible for bidding on DoD contracts requiring implementation of the NIST SP 800-171 controls, and Defendants also knew reporting the fictitious summary level score would be "misleading," at best. *See id.* ¶¶ 218, 249-253. Indeed, Caravati warned of exactly that, but Defendants reported the fictitious score anyways and never clarified to DoD that it did not apply to the entire Georgia Tech campus or any relevant system. *Id.* ¶ 200.

All told, DoD paid more than $10.2 million for work performed on the EA contract and more than $9 million for worked performed on SMOKE while Defendants were in violation of their cybersecurity obligations. *Id.* ¶¶ 286, 289.

## ARGUMENT

### I.    The United States adequately alleges Defendants were required to but did not comply with federal cybersecurity requirements.

Defendants base nearly every argument in their motion to dismiss on the flawed premise that the Astrolavos Lab conducted only "fundamental research" and therefore had no federal cybersecurity obligations. *See, e.g.,* Memo 21-25. For two reasons, Defendants' position fails to support dismissal of any claims:

First, this argument requires the Court to accept as true *Defendants'* version of the facts – that the Astrolavos Lab never conducted non-fundamental research or possessed CDI or FCI.  That approach is exactly opposite to what the Court must do at the pleading stage, which is to "accept as true [the United States'] well-pleaded allegations" and view them "in the light most favorable to the plaintiff." *McCarthy*, 111 F.4th at 1145.  Second, this argument also fails because it is based on Defendants' misinterpretation and selective reading of the regulations, which required Defendants to protect CDI and FCI in the Astrolavos Lab.

### A.    The Complaint alleges the Astrolavos Lab failed to provide adequate security for CDI and FCI.

The Complaint provides detailed allegations supporting the Astrolavos Lab's failure to adequately protect CDI and FCI, as it was required to do, in connection with EA and SMOKE.  To begin with, the Complaint alleges that from the outset, the parties contemplated that CDI, FCI, and other sensitive material would be at issue in both EA and SMOKE.

With respect to EA, the initial solicitation advised potential offerors that DFARS 7012 would apply, that the program would have classified elements, and that DARPA CUI would require protection during performance of an award. Compl. ¶¶ 105-107.  It also informed GTRC and other offerors that:

> [T]he Government expects that program goals as described herein either cannot be met by performers intending to perform fundamental research or the proposed research is anticipated to present a high

likelihood of disclosure of performance characteristics of military systems or manufacturing technologies that are unique and critical to defense. Therefore, the Government anticipates restrictions on the resultant research that will require the contractor to seek DARPA permission before publishing any information or results relative to this program.

EA Solicitation, MJN Ex. 18 at 13. With respect to SMOKE, before even executing the contract, the Astrolavos Lab requested access to CDI for its performance of the project, and the original contract was accordingly amended almost immediately to add DFARS 7012 and 7020 clauses and provide for "Non-Fundamental Research Tasks." *Id.* ¶¶ 127-128.

Consistent with these expectations, the Complaint also identifies multiple communications and admissions from Dr. Antonakakis and others to allege that the Astrolavos Lab handled CDI and FCI in connection with the awards. These include contemporaneous emails and other internal communications, as well as admissions from Dr. Antonakakis in sworn testimony. *See, e.g., id.* ¶¶ 136-150. The Complaint further alleges that notwithstanding the presence of CDI or FCI in the Lab, Defendants failed to provide adequate security and that Defendants admitted that the Lab's practices "increase[d] the risk" of a breach, amounted to "noncompliance" with applicable NIST requirements, and could result in "false claim[s]." Compl. ¶¶ 162, 166, 191.

## B.    Defendants' self-selected record does not defeat the United States' allegations.

Defendants ask the Court to ignore these well-pleaded allegations because "undisputedly authentic DoD documents" supposedly confirm the Astrolavos Lab conducted only fundamental research and foreclose any inference that it handled CDI or FCI.  Memo 21.  The only documents in Defendants' 1,000-plus pages of exhibits that the Court can potentially consider in resolving their motion to dismiss do not, however, contradict the Complaint or provide a basis for dismissal. They are instead consistent with the United States' allegations.  *See also* MJN Opp. at 4-6, n 1.

First, Defendants assert that the EA contract itself "unambiguously shows that no CDI was contemplated for EA, because it does not 'identif[y]' *any* CDI related to the contract."  Memo 22.  But the DD 254 for the EA award and the Contract Data Requirements List (CDRL), which are Exhibits 21 and 22 of Defendants' Motion for Judicial Notice, are enumerated attachments to the EA contract itself (along with other documents Defendants have not put forward).  *See* MJN Ex. 15 at 33.  Consistent with the definition of CDI, both the DD 254 and CDRL identify limited access information to be provided in connection with the project.  *See* 48 C.F.R. § 252.204-7012 (CDI is "unclassified controlled technical information or other information . . . that requires safeguarding or dissemination controls"); *see also* Compl. ¶¶ 113, 120, 141.

The DD 254, for example, identifies that the "Contractor will require access to" "[i]ntelligence information," including "sensitive compartmented information (SCI)" and "non-SCI," as well as "For Official Use Only Information." *See* MJN Ex. 21 at 1. The CDRL also identifies that information generated in connection with EA is expected to be subject to dissemination controls. *See* MJN Ex. 22 at 14. It denotes, for example, that EA Statement of Work Paragraph 4.7.5 will be subject to "Distribution Statement F." *See id.* Defendants take issue with a "TBD" notation in block 9 of the corresponding page in the CDRL, Memo 23, but ignore the accompanying remarks on the same page specifying "Block 9: Distribution Statement F: Further Dissemination Only As Directed by AFRL/RIGB" applies. MJN Ex. 22 at 14. At a minimum, the CDRL itself does not foreclose an inference that CDI *was* contemplated for EA, as the United States alleges. *See* Compl. ¶ 120.

Defendants also attempt to minimize the CDRL's implication by characterizing the Distribution Statement F reference as applicable to only "one contract deliverable." Memo 23. But EA Statement of Work Paragraph 4.7.5, which is the associated deliverable, is the documentation of "*all* technical work accomplished and information gained during performance of this acquisition." *See* EA SOW, MJN Ex. 14 at 8 (emphasis added). The United States' allegations that Defendants' own witnesses admitted the Astrolavos Lab handled information that

was subject to Distribution Statement F and considered CUI during performance of the project does not conflict with the EA contract as Defendants claim.  Memo 24.[3]

Defendants similarly argue that the SMOKE modification, which expressly added non-fundamental research tasks and was obtained because Dr. Antonakakis requested access to CDI for the project, Comp. ¶ 127, warrants dismissal because the modification's "contractual terms" demonstrate that "any non-fundamental research would not begin until October 2025" and the fundamental research tasks "were not subject to the DD Form 254 or any prepublication restrictions."  Memo 25.  The modification does not provide that no non-fundamental research will take place before October 2025 – instead, it identifies a "*Due Date*," "on or before" which, the non-fundamental research tasks should be completed and delivered.  *See* MJN Ex. 27 at 1.  It also does not establish that the Astrolavos Lab never possessed CDI or FCI in connection with performance of the award.  Again – consistent with the United States' allegations – the modification specifies: "[t]his contract involves

---

[3] Defendants also contend that the DD 254's reference to "For Official Use Only" information undermines the allegations that the Lab possessed CDI because, according to Defendants, FOUO cannot be CDI.  Memo 23-24.  But the DFARS FAQ that is the only support they offer for this position, advises that "there may be cases where the covered defense information . . . may be marked as FOUO."  MJN Ex. 2 at 28.  The document is not appropriate for consideration now, *see* Opp. to MJN at 10, but even if it were, it does not carry any water for Defendants, who in any event, ignore their additional obligations under FAR 52.204-21 to protect FCI, a category broader than CDI that encompasses all information "not intended for public release."  Compl. ¶ 93.

Controlled Unclassified Information (CUI)" and "Covered Defense Information," and only that "*papers* resulting from . . . fundamental research are exempt from prepublication controls." *Id.* at 5, 6; *see also* MJN Ex. 25 at 5 (reflecting same); Ex. 28 at 6; *see also* 88 Fed. Reg. 89058, 89068 (Dec. 26, 2023) (even in connection with "[f]undamental research," CUI or FCI may be "provided to or handled by contractors as part of contract performance" triggering cybersecurity obligations).

Defendants also attempt to shoehorn a so-called "DARPA Statement" and "AFRL Statement" into the category of "undisputedly authentic DoD documents" that supposedly foreclose the United States' claims as to EA in particular. Memo 21-22. There is, however, no plausible basis on which these two documents – unexplained email exchanges with agency staff – can appropriately be considered on a motion to dismiss. *See* MJN Opp. at 6-7. These documents, neither of which are an official statement by the agency or Contracting Officer, do not "confirm in writing" that no federal cybersecurity obligations applied to the Astrolavos Lab. Memo 22. Defendants cannot use these isolated exchanges with individual staff to avoid the United States' well-pleaded allegations, discovery, or the full record. *See, e.g., Hartman v. Meta Platforms, Inc.*, 2024 WL 4213302, at *8-9 (S.D. Ill. Sept. 17, 2024) (refusing to engage in "targeted fact-finding" on an undeveloped record to resolve motion to dismiss); *United States v. Savannah River Nuclear*

*Solutions, LLC*, 2016 WL 7104823, at *8-9 (D.S.C. Dec. 6, 2016) (declining to consider agency emails in resolving motion to dismiss). The documents Defendants offer either cannot be considered at the pleading stage and/or do not support their claims.

### C. Defendants' federal cybersecurity obligations required protection of CDI and FCI.

Moreover, Defendants fail to support the legal premise they claim requires dismissal, that "DoD's cybersecurity rules did not apply to . . . systems used to perform fundamental research." Memo 21. In seeking to establish (based on their own, disputed interpretation of the parties' contracts) that they had no federal cybersecurity obligations, Defendants rely, for example, on DoD commentary that they quote for the proposition that "Fundamental research . . . is not, by definition FCI." *Id.* 10 n.3. But the DoD commentary, published in connection with interim rulemaking, actually advises: "Fundamental research *that is 'shared broadly within the scientific community'* is not, by definition FCI or CUI; *however, other research-related information that is provided to or handled by contractors as part of contract performance may be FCI or CUI*, [and] thus may trigger application of [federal cybersecurity requirements]." 88 Fed. Reg. at 89068 (emphasis added).

In the final rule implementing DFARS 7012, DoD – responding to a request for "clarification regarding the application of the security requirements . . . to fundamental research" – similarly declined to endorse Defendants' broad

23

exemption for fundamental research, advising that although a project "appropriately scoped as fundamental research will not contain any covered defense information," "[t]he security requirements of [DFARS 7012] need to be in place when covered defense information is present."  81 Fed. Reg. 72986, 72987 (Oct. 21, 2016).  And in the final rule implementing FAR 52.204-21, DoD also declined to exclude "contracts for fundamental research from the requirements of the rule," noting instead that those requirements "should not have any chilling effect on fundamental research."  81 Fed. Reg. 30439, 30441-42 (May 16, 2016).

By their terms, the relevant DFARS provisions apply to "*all* covered contractor information systems," which the regulations define without regard to fundamental or non-fundamental research, as any "unclassified information system that is owned or operated by or for a contractor and *that processes, stores, or transmits covered defense information*." 48 C.F.R. § 252.204-7012(a), (b) (emphases added).  Indeed, as alleged in the Complaint, Defendants themselves understood that reach.  *See, e.g.,* Compl. ¶¶ 229-230 (quoting Georgia Tech policies recognizing that Defendants are "obligated to ensure that all systems and processes involved with CUI are compliant with NIST 800-171 to continue receiving Federal funds" and that NIST SP 800-171 compliance is "required . . . for all entities that handle controlled unclassified information").

## II.    The United States adequately pleads that GTRC violated the False Claims Act.

The FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government," *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), imposing liability on defendants (1) who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval," or (2) who "knowingly make[], use[], or cause[] to be made or used, a false record of statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).  To state a claim under the FCA, the government must allege four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz*, 780 F.3d at 1045 (internal citation and quotation marks omitted).  Defendants argue the FCA claims here fail because the Complaint does not plead falsity, scienter, or materiality.  Defendants are wrong.

### A.    The Complaint adequately alleges falsity.

Apart from their flawed argument that the Complaint cannot allege falsity because EA and SMOKE were for fundamental research and not subject to cybersecurity requirements, *see supra* 16-25, Defendants also ask the Court to dismiss the FCA claims because the Complaint (1) seeks to hold GTRC liable for cybersecurity requirements "enacted after the at-issue contracts" or which are "too

imprecise to support FCA liability," and (2) does not allege any "false certifications of compliance or false promises."  Memo 25, 29.  Both arguments fail.

**1.    The Complaint does not premise falsity on inapplicable or non-actionable requirements.**

First, Defendants argue that even if the federal cybersecurity requirements did apply to the EA contract, Defendants had no obligation to create an SSP because the June 2015 version of NIST SP 800-171 governs the EA award and supposedly did not require one.  Memo 26.  But applying the June 2015 version to the EA contract does not undermine falsity:  The EA contract required GTRC's compliance with DFARS 7012, which GTRC repeatedly certified.  *See* Compl. ¶¶ 106, 108, 284.  DFARS 7012 in turn required GTRC to provide "adequate security," meaning "protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access" – and "at a minimum," compliance with the applicable NIST SP 800-171 controls.  48 C.F.R. §§ 252.204-7012 (a), (b).

While Defendants claim the June 2015 version of NIST SP 800-171 excused them from implementing an SSP, their position mischaracterizes the publication. The requirement to have an SSP was not "rejected [for] inclusion," Memo 26, but rather identified in Appendix E of the June 2015 version as a control so basic that it

was "expected to be routinely satisfied by nonfederal organizations *without specification*."  Compl. ¶ 80 (emphasis added); MJN Ex. 9 at p. E-1, E-13.[4]

Defendants also argue that the failure to install antivirus software "does not establish a regulatory violation" because "the recommendation to install that software did not appear in NIST SP 800-171 until December 2020."  Memo 27.  But Defendants appear to base this argument on an unexplained distinction between antivirus software and "malicious code protections," *see id.* 27 n. 2, while failing to acknowledge these are essentially synonymous terms.  Indeed, while Defendants argue "[t]he government's claim under FAR 52.204-21 fails for the same reason: because the FAR clause also imposes the vague malicious code protections from the initial version of NIST SP 800-171," *id.*, the final rule implementing the FAR clause explains that the "basic safeguarding measures" it requires include "*updated antivirus protection*, the latest security software patches, etc."  81 Fed. Reg. at 30445 (emphasis added).

Second, Defendants contend the United States' allegations in connection with SMOKE in particular rest on SSP obligations "too vague" or "imprecise" to

---

[4] The June 2015 version further confirms, in its preamble, that "Organizations that are interested in or required to comply with the recommendations in this publication[] are strongly advised to review the complete listing of security controls in the moderate baseline in Appendix E to ensure their individual security plans and security control deployments provide the necessary and sufficient protection to address the range of cyber threats."  MJN Ex. 9 at page v.

support falsity.  *See* Memo 28.  But any "ambiguity" in the NIST SP 800-171 SSP

requirement does not foreclose falsity.  *Id.*  To the contrary, a regulatory term or

obligation that "may be ambiguous on its face" can still give rise to FCA liability.

*United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).

Defendants' argument is simply an attempt to repackage the position the *SuperValu*

Court rejected – that defendants can escape FCA liability by proffering some "*post

hoc* interpretations that might have rendered their claims accurate," even when

they knew otherwise.  *Id.* at 752.

Here, the Complaint alleges that the Astrolavos Lab's February 2020 SSP

did not satisfy the DFARS cybersecurity requirements because it "did not include

most of the desktops and laptops in the lab" and was updated only once to add

names of additional researchers who worked on the DoD contracts at issue.  *See*

Compl. ¶¶ 161, 164.  The Complaint also alleges that Defendants knew since at

least 2019 that an SSP was required at the Lab, and that the SSP belatedly put in

place was not NIST-compliant precisely because it failed to capture all relevant

desktops and laptops – a "scoping problem" that "increase[d] risk" of a breach.

*See id.* ¶¶ 162-163, 165.  Defendants further understood that failure to update the

SSP was non-compliant in the "same way" as the "failure to create an SSP in the

first place."  *Id.* ¶ 166.  That Defendants now say the NIST SSP obligations can be

interpreted different ways does not provide a basis for dismissal. To the contrary,

the Complaint is replete with allegations that Defendants' cybersecurity and contracting staff interpreted them the same way as the United States, and those allegations must be accepted as true at this stage.

The cases Defendants cite to argue that violations of DFARS and FAR provisions cannot support falsity do not counsel otherwise. *See* Memo 28. *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996) does not stand for the proposition that a defendant's interpretation of a regulation is not probative of falsity or that falsity cannot be alleged if a regulation may be open to varying interpretations. The Ninth Circuit expressly rejected such a reading of the case, explaining that it addressed FCA liability where "the statute itself granted discretion in deciding the cost allocation that the plaintiff claims was false," not where the statute or regulation, even if "unquestionably technical and complex, [is] not discretionary." *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462-63 (9th Cir. 1999). Here, DFARS 7012 and FAR 52.204-21 are mandatory and their meaning "is ultimately the subject of judicial interpretation." *Id. United States ex rel. Lamers v. City of Green Bay* did not reach the issue of falsity at all; the court instead upheld summary judgment for the defendant because the plaintiff "provided no credible evidence that the City intended to flout the regulations." 168 F.3d 1013, 1018 (7th Cir. 1999). Nor are the allegations in the Complaint like those in *United States ex rel. Wilson v. Kellogg Brown & Root Servs. Inc.*, where

"the United States government – the actual party to the contract – ha[d] not expressed dissatisfaction with KBR's performance in the form of a breach of contract action."  525 F.3d 370, 374-75 (4th Cir. 2008) (affirming dismissal after the US declined intervention of FCA claim premised on defendants' failure "to change the oil or replace the fuel filters" in some vehicles used to transport fuel to military bases).

In sum, while Defendants suggest the United States' falsity allegations rest on novel, never-before required or impossible to understand security protocols, the Complaint alleges the opposite – that Defendants failed to implement controls widely understood as so basic that any prudent businessperson – Defendants' own cybersecurity and contracting personnel included – knew they were required.

### 2. The Complaint adequately alleges that GTRC falsely certified compliance.

Defendants are also wrong that the Complaint fails to allege GTRC's express or implied certifications of compliance with EA and SMOKE.  Memo 30.  In arguing otherwise, Defendants ignore the Complaint's allegations that in bidding on EA and SMOKE, GTRC certified compliance with DFARS 7012 pursuant to DFARS 7008, specifying that "[b]y submission of [its] offer, the Offeror represents that it will implement the security requirements specified by National Institute of Standards and Technology (NIST) Special Publication (SP) 800–171 . . . that are in effect at the time the solicitation is issued or as authorized by the contracting

officer, not later than December 31, 2017." Compl. ¶¶ 65-66, 111, 129. The

Complaint also alleges GTRC's express certification of compliance with DFARS

7019 for SMOKE. *See id.* ¶ 125.

Moreover, each of the invoices GTRC submitted in connection with EA and

SMOKE also included certifications that all payments were "in accordance with

the agreements set forth in the application and award documents" or "in

accordance with the application and award documents." *Id.* ¶¶ 284, 288. Those

documents include the full text of the relevant cybersecurity regulations or

incorporate them by reference and also incorporate GTRC's representations

pursuant to DFARS 7008 and 7019. *See id.* ¶¶ 106, 108, 111-112, 124, 125, 128,

129. There is no basis to accept Defendants' self-serving characterization of them

as somehow pertaining only to "cost" or "fiscal" data. Memo 30. The United

States has adequately alleged GTRC's false certifications of compliance under

either an express or implied theory.

### 3. The Complaint adequately alleges GTRC fraudulently induced EA and SMOKE.

The Eleventh Circuit recognizes that falsity for FCA purposes "does not

have to appear in the claim itself," and instead can be "traced to the execution of

the contract." *Gose*, 109 F.4th at 1317. Thus, even if GTRC's claims for payment

under EA and SMOKE did not independently certify compliance with Defendants'

cybersecurity obligations, GTRC's "original fraud" in procuring those contracts renders false all "future claims for payment." *Id.* at 1316.

With respect to SMOKE and any other DoD contracts GTRC used its false summary level score to obtain, the Complaint alleges falsity based on that "original fraud." Rather than attempt to argue their admittedly fictitious and misleading score was not false, Compl. ¶¶ 208, 254, Defendants instead claim this theory of falsity is not adequately pleaded because the Complaint fails to allege "that DoD considered compliance with DFARS 7012 or 7019" in awarding SMOKE or "even looked up the Astrolavos Lab's self-assessment score." Memo 33. But in reality, the Complaint alleges that absent a current and accurate summary level score for each relevant system, Defendants did not meet a condition of contract, were ineligible to even bid on SMOKE, and thus could not even have been considered for the award. *See* Compl. ¶¶ 72, 73, 297, 304. Neither Rule 8 nor Rule 9(b) require more. In this context, inducement, is "based on the agency's own rules and regulations," not what an individual contracting officer did or did not do. *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) (otherwise, "resolution of each case would depend on whether . . . a decisionmaker could be identified and located, and whether the particular person would have treated the claim as material, regardless of whether they were one of several charged with evaluating the claims at issue"); *United States v. Rogan*, 517 F.3d 449, 452-53 (7th

Cir. 2008) (reliance is established where "the truth would have revealed that reimbursement is illegal" and rejecting assertion "that some disbursing officer had to testify that the United States does not pay illegal claims").

Defendants similarly claim that GTRC could not have induced the EA award with "promise[s] to comply with DFARS 7012" because DoD supposedly did not seek GTRC's DFARS 7008 certification "until *after* GTRC was awarded the contract." *Id.* But the October 31, 2016 award letter on which Defendants rely in making this argument states only that "the Government *contemplates entering into negotiations with your firm*," requesting certain information – including a DFARS 7008 representation – "[i]n order to *prepare for negotiations*." MJN Ex. 19 at 1-2 (emphases added). The EA contract was not executed until the following month, and the Astrolavos Lab began work the month after that. *See* Compl. ¶¶ 102, 111.[5]

### B.    The Complaint adequately alleges scienter.

While it "matters for an FCA case . . . whether the defendant knew the claim was false," knowledge may be shown three ways: (1) "actual knowledge of the

---

[5] Defendants also argue GTRC made no DFARS 7008 certification "by submitting a proposal" in response to "the EA solicitation" because "DoD did not include DFARS 7008 in the EA solicitation," Memo 30, but that has little relevance. When the EA solicitation was issued in April 2016, the DFARS 7008 final rule had not yet been implemented. *See* MJN Ex. 18; Compl. ¶ 71. The October 31, 2016 "award letter" was sent days after DFARS 7008 went into effect, *see id.*, included the full text of DFARS 7008, and required GTRC to represent that it would be DFARS 7012 compliant no later than December 31, 2017. *See id.* ¶¶ 111-112. By executing the contract, GTRC certified that it would.

information," (2) "deliberate ignorance of the truth or falsity of the information," or (3) "reckless disregard of the truth or falsity of the information." *SuperValu*, 598 U.S. at 743, 749.  At the pleading stage, "general allegations [of scienter] are sufficient." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012).

Here, Defendants argue that the Complaint fails to plausibly allege scienter supporting a fraudulent inducement theory of FCA liability.  With respect to EA, Defendants again rest this argument on the flawed premise that GTRC never promised to comply with DFARS 7012 prior to contracting.  *See supra* 33. Defendants also take aim at the Complaint's supposed failure to plead specific facts about their intent at the precise moment each contract was executed.  *See* Memo 35-36.  Defendants ignore that there are "two major variations of the fraudulent inducement theory," one in which "a party makes promises at the time of contracting that it intends to break" and another that "requires that false statements induced the government to make the initial contract or caused it to agree on particular contract terms."  *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 105 (D.D.C. 2017) (internal citations and quotations omitted).

In any event, viewed in the light most favorable to the United States, the Complaint sets forth numerous facts to infer Defendants' state of mind at the time of contracting.  *See Autumn Vista Hldgs., LLC v. Timbercreek Autumn Vista, LP*,

2017 WL 11692619, at *8 (N.D. Ga. Sept. 8, 2017) (at the pleading stage, fraudulent intent can be inferred from allegations of "subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would have been expected from a contracting party acting in good faith") (internal citation and quotation marks omitted).  For example, with respect to EA, the Complaint identifies internal correspondence documenting Caravati's knowledge in August 2019, soon after the Astrolavos Lab began marking presentations containing CDI as Distribution Statement F, that the Lab needed an SSP in place to be compliant with the award.  *See id*. ¶¶ 139-140, 159.  But at the same time, no SSP was in place – nor did Defendants even attempt to implement one until February 2020, more than six months later.  *See id.*  ¶¶ 155-158.  And even when they did, the SSP was by Defendants' own admissions still not NIST-compliant.  *See id.* ¶¶ 161-168.

The Complaint similarly identifies internal correspondence reflecting Defendants' knowledge that the Lab was required to but failed to run antivirus controls throughout performance of the EA contract.  Indeed, contrary to Defendants' present assertion that the Complaint fails to allege GTRC knew DFARS 7012 and NIST SP 800-171 required "antivirus software for the relevant lab," Memo 34, the Complaint references communications reflecting that GTRC and Georgia Tech believed they were at risk for a "false claim" for this very reason.  *See* Compl. ¶¶ 190-198.

The facts alleged are just as strong with respect to SMOKE.  The conclusion that GTRC had no intention of fulfilling its cybersecurity obligations in connection with SMOKE is amply supported by the United States' allegations that in order to even bid on that award, GTRC reported a falsified and fictitious summary level score supposedly documenting campus-wide NIST compliance that it knew was misleading.  *See, e.g., id.* ¶ 199.  And while Defendants claim scienter cannot be inferred because they were unaware SMOKE "would require implementation of NIST SP 800-171 . . . when GTRC submitted its offer and executed the contract," Memo 36, that contention ignores that SMOKE was modified almost immediately after its execution – and indeed, that the modification was initiated prior to the initial award – to accommodate Dr. Antonakakis' request to access CDI in connection with the project.  *See* Compl. ¶ 127.  Moreover, these allegations are coupled with others reflecting Defendants' own admissions that high-level personnel at GTRC and Georgia Tech did not take cybersecurity obligations seriously and caved to the resistance of Dr. Antonakakis and other prominent researchers in failing to carry those obligations out.  *See id.* ¶¶ 8-11, 187-188, 237, 255.  The Complaint plausibly alleges that GTRC never intended to comply with its federal cybersecurity requirements. *See, e.g.*, *Autumn Vista*, 2017 WL 11692619, at *8 (refusing to dismiss even "thin" allegations of fraudulent intent to perform because "present intent is a fact-specific issue").

**C.    The Complaint adequately alleges that failure to comply with the cybersecurity requirements is material.**

Material under the FCA means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).  A matter is material if: (1) "a reasonable man would attach importance to it in determining his choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016).  The materiality inquiry is "holistic," and "no single element" is dispositive.  *United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1352 (11th Cir. 2021).  Relevant factors may include: (1) whether violation of a requirement "went to the essence of the [government's] bargain," (2) "to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior," and (3) "whether the requirement is a condition of the government's payment."  *Id.* at 1347.  Here, the Complaint adequately pleads materiality.

***Essence of the Bargain:*** "[C]ommon sense" alone supports the materiality of the cybersecurity requirements Defendants allegedly breached. *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (reversing dismissal). Particularly in the context of the EA and SMOKE projects, the reasons why are

obvious:  DoD contracted with Defendants to develop technologies that could

enable the identification of parties behind cyberattacks and limit such attacks in the

first place.  *See* Compl. ¶¶ 104, 123.  DoD entered these contracts against a

backdrop of "ongoing malicious cyber activities" threatening "national security"

and targeting "the vulnerabilities of [DoD] contractors' networks and systems" to

"exfiltrate information related to some of the Nation's most valuable advanced

defense technologies."  *Id.* ¶¶ 2-3.  Throughout the relevant time, this threat was

especially acute for research universities, which are "prime targets for foreign

adversaries."  *Id.* ¶ 4.  Georgia Tech itself has fallen victim to cyberattacks.  *See id.*

Because of Defendants' noncompliance, DoD does not have assurance that

the technologies it paid for remain uncompromised and effective to use for their

intended cyber warfare purposes.  *See id.* ¶ 291.  The violations alleged in the

Complaint thus necessarily undermine a core purpose of the contracts.  For

example, as the EA solicitation sets forth, DoD's objective "is to not only collect

and validate [cyber attribution] information, but to create the means to share such

information with any number of interested parties *without putting at risk the*

*sources and methods used for collection*."  MJN Ex. 18 at 4 (emphasis added).  Just

as "it strains credulity to argue that the government's payment decision would not

have been affected had the government known the [guards] responsible for

protecting U.S officials in Afghanistan had not fulfilled [a contractual] weapons

qualifications component," *United States ex rel. v. Academi Training Ctr., Inc.*, 220 F. Supp. 3d 676, 682 (E.D. Va. 2016), it strains credulity to argue that DoD would not have cared whether Defendants left the gates to the Astrolavos Lab open during the multiyear period when the Lab was doing little to nothing to protect its DoD research.  *See id.* (denying motion for judgment on pleadings); *United States ex rel. Fahn v. GardaWorld Fed. Servs., LLC*, 2024 WL 1605313, at *10 (M.D. Ga. Apr. 14, 2024) (finding, at summary judgment, that failure to conduct required trainings of security staff violated "[t]he essence of the bargain," *i.e.*, the provision of "*effective* security to the Embassy").

To distract from this conclusion, Defendants argue that their cybersecurity obligations are "unimportant" and "insubstantial" because DFARS 7019 allows for summary level scores based on self-assessment, does not set a minimum score contractors are required to obtain, and DFARS 7012 permits contractors to "have a plan" to implement each NIST control.  Memo 38-39.  This is the same type of argument the *GardaWorld* court rightly rejected at the pleading stage.  *See United States ex rel. Fahn v. GardaWorld Fed. Servs., LLC*, 2022 WL 2655777 at *12 (M.D. Ga. Jul. 8, 2022).   There, the defendant, who had a contract with the State Department to provide embassy security, sought to insulate itself from FCA liability by claiming that a provision in its contract "allowing a certain percentage of employees to be openly unqualified" rendered immaterial its scheme to make

unqualified employees appear billable. *Id.* In refusing to dismiss the complaint, the district court observed that defendant's argument overlooked "the primary aspect of [the] allegations – that GardaWorld falsified documents to cover up the fact that employees were unqualified." *Id.* (the contractual provision "allowing a certain percentage of employees to be openly unqualified does not allow for falsification of records with impunity"). That the cybersecurity regulations provide certain flexibilities to DoD contractors who appropriately avail themselves of those flexibilities does not authorize GTRC to report admittedly "misleading" assessment scores to DoD or conceal knowledge that, for years, it was not complying with DFARS and FAR obligations. Compl. ¶¶ 185-191, 208-210, 255.

Moreover, even if a reasonable person could somehow be unaware that DoD would attach importance to the contractors' self-assessment and disclosure of NIST compliance, GTRC's own conduct as alleged in the Complaint demonstrates its awareness that DoD would. *Escobar*, 579 U.S. at 193. Indeed, Georgia Tech's own website recognized that it was important to comply with the very regulations at issue because a failure to do so "may result in contract termination and the loss of contract funds." Compl. ¶ 231.

***Government Action:*** Although Defendants claim the government has "done virtually nothing" in response to their alleged misconduct, Memo. 37, the Complaint itself "militates strongly in favor of materiality." *United States ex rel.*

*Longo v. Wheeling Hosp., Inc.*, 2019 WL 4478843, at *10 (N.D. W. Va. Sept. 18, 2019) (intervention supports materiality); *see also Triple Canopy, Inc.*, 857 F.3d at 179 (same).  Contrary to Defendants' assertion that the United States has not "s[ought] to recoup payment," Memo. 37, the Complaint seeks just that.  *See* Compl. ¶¶ 297, 305 (seeking treble damages for the FCA violations).

Defendants also ignore the Complaint's allegations that in August 2024, DARPA issued a cure notice in connection with SMOKE (which, unlike EA, remains in performance) advising Defendants that their cybersecurity violations "endanger[] performance of the contract" and could result in contract termination if not corrected.  *Id.* ¶ 280.  The cure notice and the United States' notice of intervention are both strong allegations of government action to support materiality.  *See Bibby*, 987 F.3d at 1351-52 (looking holistically at government's actions to assess materiality); *see also United States ex rel. Permenter v. EClinicalWorks, LLC*, 2022 WL 17478238, at *11 (M.D. Ga. Dec. 6, 2022) (materiality does not require the government to take "the strongest possible action" and holding that issuance of cure letter supported materiality at the pleading stage).

To the extent Defendants claim the government should have done more sooner, Memo 40, they wrongly equate the filing of relators' complaint with the United States' "knowledge of *actual* wrongdoing."  *United States v. Burkich*, 2022 WL 4236243, at *8 (N.D. Ga. Sept. 14, 2022).  Courts routinely reject the very

argument Defendants make. *See, e.g. id.*; *United States v. Pub. Warehousing Co. KSC*, 2017 WL 1021745, at *6-7 (N.D. Ga. Mar. 16, 2017) ("mere suspicion of wrongdoing is not enough").

Moreover, analysis of this factor should look at the government's "behavior holistically." *Bibby*, 987 F.3d at 1351 ("divorc[ing]" its analysis "from a strict focus on the government's payment decision" alone). While Defendants take issue with a supposed "dearth of DoD action to counter noncompliance" in the industry, Memo 39, the Complaint reflects that throughout the relevant time, DoD has continually strengthened its cybersecurity regulatory requirements, making clear each time that they are central to its contracts. *See, e.g.,* 80 Fed. Reg. 51739, 51741 (Aug. 26, 2015) (highlighting the "urgent need to protect covered defense information and gain awareness of the full scope of cyber incidents being committed against defense contractors" in connection with interim rule implementing current version of DFARS 7012); 85 Fed Reg. 61505, 61517-19 (Sept. 29, 2020) (advising, in interim rule enacting DFARS 7019 and 7020, that the provisions seek "to ensure[] contractors and subcontractors focus on full implementation"); *see also* Compl. ¶¶ 264-270, 275.

Consistent with this, the only court to have considered the materiality of DoD's cybersecurity requirements to date concluded that "[i]t may be reasonably inferred that compliance was significant to the government because without

complete knowledge about compliance, or noncompliance, with the clauses, the government cannot adequately protect its information." *United States ex rel. Markus v. Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 297093, at \*7 (E.D. Cal. Feb. 1, 2022) (denying defendants' motion for summary judgment on materiality).

Finally, the inspector general reports Defendants reference in a footnote, Memo 40 n. 12, provide no basis for the Court to conclude, at the pleading stage, that DoD entered into contracts similar to those here knowing of fabricated scores or false certifications of compliance. *See, e.g., Bibby*, 987 F.3d at 1351 (asking whether evidence existed that agency entered into loan guarantees where it knew improper fees were added); *Aerojet*, 2022 WL 297093 at \*7 (rejecting argument that "compliance with DFARS and NASA FARS was nonmaterial because the government awarded contracts to other contractors" knowing "they were noncompliant" because "the court cannot speculate as to other contractors' level of non-compliance"); *see also* MJN Opp. at 10.

**Condition of Payment:**  In light of its importance, DoD has made compliance with federal cybersecurity requirements a condition of contract, and thus a condition of payment.  By its very terms, DFARS 7019 mandates that a contractor must have a current assessment of its NIST SP 800-171 compliance posted in SPRS as a "[r]equirement" "*to be considered* for award."  48 C.F.R. § 252.204-7019(b) (emphasis added).  DoD now also requires contractors to

expressly certify compliance with DFARS 7019 at the time of bidding, which

GTRC did for SMOKE.  *See* Compl. ¶ 276.  DoD also mandates that contractors

"are required to provide adequate security on all covered contractor systems," 48

C.F.R. § 204.7302(a)(1), and that the DFARS 7012 requirements "shall be

implemented." 48 C.F.R. § 252.204-7008(b).  Failure to do so "may be considered

a material breach of contract."  Compl. ¶ 279.

     Defendants acknowledge that "the Complaint alleges that the DoD

cybersecurity rules were conditions of *contract,*" but contend that fails to support

materiality because this factor "applies only to conditions of payment, which

*Escobar* made clear are different."  Memo 41.  Defendants get *Escobar* wrong.

There, the Court "rejected the distinction between conditions of payment of funds

and conditions of participation in a federal program" as key to its analysis.  *United*

*States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 Fed. Appx.

101,104 (3d Cir. 2018).  Instead, *Escobar* cautioned *against* placing too much

emphasis on whether a provision is a condition of *payment* alone because, in part,

that could preclude a finding of materiality when a defendant "misrepresent[s]

compliance with a condition of eligibility to even participate in a federal program."

579 U.S. at 192.  As this language implies, "mispresenting compliance with a

condition of eligibility to even participate in federal program . . . can be

particularly important in a materiality analysis." *United States ex rel. Lemon v.*

*Nurses To Go, Inc.*, 924 F.3d 155, 160 n. 20 (5th Cir. 2019) (reversing dismissal).

Accordingly, this factor in the holistic analysis also supports materiality.

### III.   The United States' common law claims stand.

In seeking dismissal of the United States' common law claims, Defendants largely recycle the arguments addressed above, contending that many of the claims should be dismissed because (1) Defendants' misrepresentations are not "material,"[6] (2) the Astrolavos Lab conducted only fundamental research and did not possess CDI or FCI,[7] and (3) the United States fails to allege reliance on Defendants' false summary level score.[8]  Just as these arguments provide no basis to dismiss the FCA claims, they do not support dismissal of the common law counts, which other than fraud, need not even be plead with particularity. Defendants' additional claim-specific arguments also fall short.[9]

### A.    Fraud is adequately pleaded as to both Defendants.

Count III alleges fraud against both Defendants based on their submission of the fraudulent summary level score.  Compl. ¶ 307.  Defendants assert the claim should be dismissed as to Georgia Tech specifically because "the Complaint does not plead facts with particularity supporting its claim that *Georgia Tech* made any

---

[6] *See* Memo 44 (fraud), 47 (negligent misrepresentation), 50 (breach of contract).

[7] *Id.* at 44 (fraud), 46 (negligent misrepresentation), 49-50 (breach of contract).

[8] *Id* at 44-45 (fraud).

[9] The United States' common law claims arise under and are governed by federal common law.  *See United States v. Kimbell Foods*, 440 U.S. 715, 726 (1979).

misrepresentations at all" as "GTRC, not Georgia Tech, submitted the SPRS score."  Memo 43.  But the Complaint alleges that Blake Penn, a Georgia Tech employee and head of its Governance, Risk and Compliance Team, along with Eric Gill, a member of Georgia Tech's cybersecurity team, submitted the summary level score to DoD on December 3, 2020, and that they did so at the direction of Georgia Tech's Office of Sponsored Programs.  Compl. ¶¶ 40, 201, 252, 256.

Even if Defendants did not overlook these allegations, "the law does not focus on whether the alleged misrepresentation was directly transmitted to the plaintiff" – "it focuses on whether the defendant had reason to expect the misrepresentation would reach the plaintiff and induce reliance." *United States ex rel. Hueseman v. Prof. Compounding Ctrs. of Am., Inc.*, 664 F. Supp. 3d 722, 755 (W.D. Tex. 2023) (denying motion to dismiss federal common law fraud claim based on argument that "the complaint does not and cannot allege that [defendant] made any representation whatsoever to Tricare"). Here, the Complaint alleges that Georgia Tech employees participated in developing the false summary level score with the understanding that it would be used to bid on DoD awards, the profits of which would be shared between Georgia Tech and GTRC.  *See* Compl. ¶¶ 18, 29, 248-253.  These allegations support Georgia Tech's false representation.

Defendants also argue that Count III should be dismissed entirely because "[t]here is no allegation the government did not receive the research" they

contracted to perform. Memo 45. This ignores a central premise of the United States' claim: that Defendants induced DoD to award contracts that Defendants were, in fact, ineligible to obtain. *See* Compl. ¶¶ 307-313. The United States then paid millions of dollars on false pretenses. *Id*. ¶¶ 289, 290. There is no requirement that the United States allege it never received research from Defendants to state such a claim. Indeed, courts have held that DoD is harmed when contractors fail to implement cybersecurity controls, even if contracted services are otherwise provided. *See Aerojet*, 2022 WL 297093, at *8 (rejecting argument that "there is no evidence the government suffered actual damages). Instead, the government is often "entitled to the entirety of its payments" made under a contract procured by fraud. *See, e.g.*, *United States ex rel. Marsteller v. MD Helicopters, Inc.*, 2021 WL 4409093, at *6 (N.D. Ala. Sept. 27, 2021). To the extent a lesser measure of damages is ultimately appropriate, that is a factual question for the jury. *See id* at *6-7; *Aerojet*, 2022 WL 297093 at *8.

Regardless, Defendants concede that the Complaint alleges that the United States did not receive the full benefit of its bargain because the Astrolavos Lab's work was not kept secure. *See* Memo 45. The failure to implement basic security controls, or disclose the Lab's non-compliance to DoD in the face of cyber threats directed at American research universities, and Georgia Tech in particular, jeopardized the value of the contracts and caused harm.

**B.     The United States adequately pleads negligent misrepresentation.**

The United States pleads two negligent misrepresentation claims: one based on the false summary level score and one based on the misrepresentations of compliance with DFARS 7012.  Compl. ¶¶ 320, 325-26.  As to the first, Defendants simply reference the same flawed arguments they make to dismiss the common law fraud claim.  *See* Memo 46.  As to the second, Defendants echo their hollow assertions that the United States has suffered no harm, and fails to allege that Defendants should have known their misrepresentations were false or that they were material.  Those arguments fail for the same reasons as above.

**C.     The United States' unjust enrichment and payment by mistake claims are not barred.**

As to the United States' unjust enrichment and payment by mistake claims, Defendants primarily argue that the DoD contracts preclude them.  *See* Memo 47-48.  That argument has no merit at this stage of the case.  Instead, Rule 8 specifically permits a party to plead "as many separate claims or defenses as it has," even if it may not ultimately recover on inconsistent theories.  Fed. R. Civ. P. 8(d)(3).  Indeed, the Eleventh Circuit has long recognized that a party may "pursue alternative theories of recovery, regardless of their consistency . . .  without being barred by the election of remedies."  *See Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540-41 (11th Cir. 1986) (district court erred in choosing for plaintiff by dismissing one claim); *Nat'l Maritime Servs., Inc. v. Staub*, 2010 WL 4553918, at

*2 (S.D. Fla. Nov. 3, 2010) (under *Allstate*, plaintiff's claims for unjust enrichment and breach of contract "may travel together in [its] Complaint").

In the FCA context, courts thus have allowed the United States to plead quasi-contractual claims even when there is an express contract. *See, e.g.*, *United States ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 914 (N.D. Cal. 2022); *United States v. BNKP Paribas SA*, 884 F. Supp. 2d 589, 616-17 (S.D. Tex. 2012); *United States v. United Techs. Corp.*, 255 F. Supp. 2d 779, 785 (S.D. Ohio 2003). This is especially true when the contract was allegedly induced by a defendant's fraud, as the Complaint pleads here. *See, e.g.*, *United States v. Intelligent Fiscal Optimal Solutions, LLC*, 2022 WL 4537785, at *4 (D. Md. Sept. 28, 2022); *DynCorp*, *LLC*, 253 F. Supp. 3d at 114. Moreover, Defendants' argument is particularly unavailing as to Georgia Tech because the United States contracted with and pleads its breach of contract claims as to GTRC alone. *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4368980, at *11 (S.D. Fla. Sept. 19, 2011) (declining to dismiss unjust enrichment claim when defendant had "no contract governing *its* relationship with Plaintiffs").

## D.    The United States adequately alleges breach of contract.

The United States' breach of contract claim is pled against GTRC and premised on its breaches of the same cybersecurity obligations underlying the United States' FCA claims. Defendants primarily argue the breach of contract

claim should be dismissed because "even assuming the [cybersecurity] provisions did apply," Defendants' failures to provide adequate security, or comply with DFARS 7019 and 7020 were not "fundamental" breaches that Defendants posit are required to state a claim. *See* Memo 49-50. To state a breach of contract claim under federal common law, the United States need only allege: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 651 F. Supp. 3d 95, 116 (D.D.C. 2023). Regardless, casting their failures as trivial, Defendants again ask the Court to ignore how their own employees saw them at the time and ignore the "central purpose" of their contracts with DoD – to develop *reliable* cyber defense technology – which plainly is undermined if there are concerns that the technology is compromised. *Unibright Ventures GmBH v. Provide Tech. Inc.*, 2023 WL 6214885, at *3 (N.D. Ga. Jul. 20, 2023). To the extent the United States needs to allege a "fundamental" breach, it has.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court deny Defendants' motion to dismiss in full. Should the Court be inclined to grant any portion of Defendants' motion, the United States requests that it be granted without prejudice so that the United States may seek leave to amend.

Respectfully submitted,

BRIAN M. BOYNTON
PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL
CIVIL DIVISION

/s/ Joanna G. Persio_____
JAMIE ANN YAVELBERG
SARA MCLEAN
JOANNA G. PERSIO
TRIAL ATTORNEY, CIVIL DIVISION
D.C. Bar No. 988614
U.S. Department of Justice
175 N. Street NE, Rm 10.104
Washington, D.C. 20002
Telephone: (202) 616-3677
joanna.g.persio@usdoj.gov

RYAN K. BUCHANAN
UNITED STATES ATTORNEY

ADAM D. NUGENT
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 381008
MELANIE D. HENDRY
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 867550
600 Richard B. Russell Federal Bldg.
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
Telephone: (404) 581-6000
adam.nugent@usdoj.gov
melanie.hendry@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. CHRISTOPHER CRAIG AND KYLE KOZA, <br>       PLAINTIFFS, <br><br> *v.* <br><br> GEORGIA TECH RESEARCH CORP. AND BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA (D/B/A THE GEORGIA INSTITUTE OF TECHNOLOGY), <br>       DEFENDANTS. | Civil Action No. <br><br> 1:22-cv-02698-JPB |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing document has been prepared using Times New Roman, 14-point font.

/s/Joanna G. Persio

TRIAL ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. CHRISTOPHER CRAIG AND KYLE KOZA,<br><br>          PLAINTIFFS,<br><br>     *v.*<br><br>GEORGIA TECH RESEARCH CORP. AND BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA (D/B/A THE GEORGIA INSTITUTE OF TECHNOLOGY),<br><br>          DEFENDANTS. | Civil Action No.<br><br>1:22-cv-02698-JPB |

## **CERTIFICATE OF SERVICE**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

     This 20th day of December, 2024.


     /s/Joanna G. Persio

     TRIAL ATTORNEY